# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KEVIN L. MCKENZIE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10-CV-496-PJC |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Claimant, Kevin L. McKenzie ("McKenzie"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his applications for disability benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. McKenzie appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that McKenzie was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background

At the time of the hearing before the ALJ on July 29, 2008, McKenzie was 46 years old. (R. 22). McKenzie had a GED. (R. 23). McKenzie testified that he had worked for an automobile wrecker and salvage business since 1978. *Id.* In 1995, he was injured on the job in

an explosion, and he then continued to work in the office as a manager. (R. 23-24). When his boss died in 2003, he bought the salvage. (R. 24). On June 2, 2005, McKenzie was in a motor vehicle accident. (R. 21). At the time of the hearing in 2008, McKenzie's business was limited because he could not afford employees to do the physical work, and he could not afford insurance. (R. 24-25). He was still operating the automobile wrecker aspect of his business on a limited basis. (R. 25-26).

McKenzie testified that pain was his primary medical problem. (R. 26). The pain was in his upper torso, including his neck, his right shoulder, and his hands. (R. 26-27). He had been diagnosed with reflex sympathetic dystrophy, and he understood from his physician that it affected his nerve endings so that he was constantly in pain after the explosion. (R. 27, 39). That condition had not improved. (R. 27).

In describing his problems with his hands, McKenzie said that he did not have good feeling in them, and he dropped things often. (R. 28). Cold temperatures were especially painful for his hands. *Id.* He said that it was painful for him to hook up cars to his wrecker with his problems with his upper torso, because it involved getting underneath the car and putting the hook on it. *Id.* He did it, even though it was painful, because it was "part of the job." *Id.* He had previously had assistance from his daughter, who was unable to continue after November 2007. *Id.*

Hooking up the cars to the wrecker did not involve any fine manipulation. (R. 29). If McKenzie had to do repetitive fine manipulative, such as using a rachet on a long bolt, his arms and hands would hurt. *Id.* He would have trouble rebuilding an auto part such as a carburetor because he would drop small parts. *Id.*

2

He had constant pain in his arms and hands that varied in degree and that he described as needles, burning, and sometimes throbbing. (R. 29-30). He had previously had surgery on his right shoulder, and it continued to pop. (R. 30). He had pain when he moved his arm in certain directions, such as stretching it over his head. *Id.* He had previously had surgery on his neck, and he continued to have problems, including loss of motion to the side and up and down. *Id.* He also had pain and headaches that were sometimes so severe that they affected his eyesight. *Id.* He had bad headaches twice a week, but he had migraines two or three times a month. (R. 31). His doctors had prescribed naprosyn for headaches and had directed him to double or triple it when the headaches were severe. (R. 31-32). The medication, along with lying down in his recliner and relaxing, helped. (R. 32, 36). He was sometimes nauseated with a migraine headache, and it would take between two hours to all day to recover from a migraine headache and to be able to function. (R. 32).

McKenzie testified that he no longer mowed the lawn, and he didn't do any cleaning, laundry, or vacuuming. (R. 32-33). He liked to cook, and he did it about once a week. (R. 33). He liked to do a lot of driving in his car to "clear his head." *Id.* He would have to stop occasionally to walk around. (R. 33-34). During the day, he would often go to his business and do "book work." (R. 35-36).

He used to like to attend sports events, but he couldn't do that any more because the seating was too hard, and he couldn't sit. (R. 34). Sitting in a chair, he thought that he could sit about 30 minutes before needing to change positions. *Id.* He had tried standing, and he knew that he could only stand for about five minutes at a time because it caused too much pain if he was trying to use his arms. (R. 34-35). He could walk a couple of blocks, but then he would

have pain in his lower back and hips. (R. 35). He thought that he could lift and carry 15 pounds, but he often dropped items that weighed much less. *Id.*

When McKenzie needed to lie down during the day, he would go home and use his recliner. (R. 36). He got better rest in his recliner than in a lying down position. *Id.* He often slept in his recliner and then moved to his bed for the rest of the night. *Id.* He estimated that he got about four or five hours of sleep altogether typically. *Id.* He would be tired in the morning and not want to do anything. *Id.* Since the injury, he had little energy. (R. 36-37). He estimated that he had gained about 40 pounds due to the inactivity caused by his injuries. (R. 37).

When he was trying to do "book work," he would have problems with concentration and focus. *Id.* He would do that work for around 20 minutes, and then he would get up and walk around. *Id.* If he didn't stop and take a break, he would make a lot of mistakes. *Id.*

If his pain was severe, and he had to take a Lortab, it had the side effect of making him violent, mean, and short-tempered. (R. 38). It also made his drowsy, and he would not answer a wrecker call if it came after he had taken Lortab. *Id.*

On June 2, 2005, McKenzie was treated at the emergency room of Saint Francis Hospital following a motor vehicle accident. (R. 231-48). The records show that his vehicle rolled over in the accident, and his primary complaints were pain in his mid back and right shoulder. (R. 232).

McKenzie saw James R. Priest, M.D. on June 8, 2005. (R. 255). Dr. Priest felt that McKenzie was doing fairly well, and he noted that McKenzie was taking Lortab and Flexeril about three times a day. *Id.* While McKenzie reported that he had been working in a supervisory capacity, Dr. Priest advised him to rest. *Id.* On June 14, 2005, McKenzie complained of

4

worsening pain in his shoulder, neck, and upper back, and Dr. Priest found on examination that McKenzie was tender to touch of his shoulder and upper back, while his neck appeared fairly normal. *Id.* He continued McKenzie on pain medication and Flexeril and scheduled McKenzie for MRI studies. *Id.* Dr. Priest advised McKenzie not to work. *Id.*

The MRI studies, dated June 17, 2005, showed that McKenzie's neck was within normal limits except for the C6/C7 level, which had a "mild broad-based disk herniation narrowing the ventral subarachnoid space." (R. 251). There was also "bilateral foraminal stenosis" at that level. *Id.* His right shoulder had a partial rotator cuff tear, with acromioclavicular joint edema and hypertrophy. (R. 250). The MRI of McKenzie's thoracic spine showed multiple levels of mild superior endplate indentation. (R. 249). The reviewing physician stated that this raised "the question of subacute mild compression fracture." *Id.*

McKenzie returned to Dr. Priest on June 20, 2005, after the MRI studies, and Dr. Priest recommended that he address the issues with his right shoulder first, and then his neck. (R. 254). He refilled McKenzie's medications and made referrals for further treatment. *Id.*

There are records of office visits with a family practice, and while they do not clearly name the physician, the undersigned concludes that they are records of Dr. Phillip Knight and will refer to them as such.[1] (R. 271-72, 274-88). McKenzie apparently saw Dr. Knight for the first time on July 8, 2005. (R. 286-88). Dr. Knight appeared to give prescription medications, referrals for physical therapy and for MRI and bone scan studies, and referrals to Dr. Munson and

---

[1]The undersigned's conclusion is based on numerous cross-references in the medical records. For example, the record of McKenzie's first visit with Dr. Knight includes a note scheduling an MRI of his lower spine for July 14, 2005. (R. 288). The MRI report on that date then states that Dr. Knight was the ordering physician. (R. 284).

Dr. Remondino. (R. 288). On July 12, 2005, Dr. Knight assessed McKenzie's condition as being the same. (R. 285). An MRI of McKenzie's lumbar spine done on July 14, 2005, showed no significant abnormalities. (R. 284).

On July 27, 2005, Mark E. Munson, M.D. with Stillwater Orthopedic & Sports Medicine Associates wrote a letter to OK Farm Bureau reporting on his evaluation of McKenzie's right shoulder. (R. 189). Dr. Munson reviewed the background of McKenzie's motor vehicle accident on June 2, 2005. *Id.* McKenzie had problems in his neck and back, but his chief discomfort was his right shoulder. *Id.* On examination, Dr. Munson found that McKenzie had limited range of motion of his right shoulder, along with pain, popping, and crepitus. *Id.* Dr. Munson's review of x-rays and a report from an MRI suggested to him that McKenzie suffered from some arthritis and a possible full-thickness rotator cuff tear. *Id.* Dr. Munson injected the joint and referred McKenzie for physical therapy, but stated that arthroscopy and repair of his shoulder would be necessary if there was no improvement. *Id.* Dr. Knight also saw McKenzie on July 27. (R. 283). On August 24, 2005, Dr. Munson believed that McKenzie's right shoulder symptoms were getting worse. (R. 187).

On August 29, 2005, Robert L. Remondino, M.D. with Neuroscience Specialists wrote a letter to McKenzie's attorneys. (R. 198-99). Dr. Remondino recounted the history of the June 2, 2005 motor vehicle accident and stated that McKenzie subsequently developed neck pain, headaches, and bilateral upper extremity numbness that had "become progressively more severe." (R. 198). On examination, Dr. Remondino found that McKenzie's range of motion of his neck was restricted in all directions, and he had mild tenderness. *Id.* The physician's review of a cervical MRI showed a broad-based central disc herniation at the C6/C7 level. *Id.* He believed

this herniation was the source of McKenzie's symptoms. (R. 199). If McKenzie's symptoms persisted, Dr. Remondino would recommend an anterior cervical discectomy and fusion. *Id.*

On August 31, 2005, Dr. Knight noted that Dr. Munson had scheduled surgery on the right shoulder. (R. 282). Dr. Knight's assessment was the same, and he continued McKenzie's medications. *Id.* On September 8, 2005, Dr. Munson did surgery on McKenzie's right shoulder. (R. 261-63). The postoperative diagnoses were chronic impingement syndrome, tear of the anterior - superior glenoid labrum, and complete tear of the rotator cuff. (R. 261).

In a September 26, 2005, letter, Dr. Munson recounted that McKenzie had undergone arthroscopic repair of his shoulder on September 8, 2005. (R. 185). Dr. Munson believed that the shoulder was healing well, and he had prescribed physical therapy. *Id.* He restricted McKenzie from lifting. *Id.* McKenzie also saw Dr. Knight on September 26, as well as on October 24, November 8, November 30, and December 20, 2005. (R. 277-81).

Dr. Remondino performed surgery on McKenzie's C6/C7 disc herniation on December 30, 2005. (R. 201-03).

McKenzie saw Dr. Knight on February 27, 2006, and Dr. Knight considered that McKenzie's assessment was the same. (R. 276).

On March 1, 2006, Dr. Munson believed that McKenzie had "essentially full function with no limitations" of his right shoulder, and he discharged McKenzie from his care. (R. 182). On March 13, 2006, McKenzie saw Dr. Knight, whose assessment remained the same. (R. 275).

McKenzie saw Dr. Remondino on April 3, 2006 for follow-up after the neck fusion surgery. (R. 196). McKenzie reported that he continued to have neck pain, bilateral arm pain, and headaches, as well as restricted range of motion. *Id.* On April 4, 2006, McKenzie returned to

7

Dr. Knight, whose assessment remained essentially the same. (R. 274).

McKenzie saw S. V. Vaidya, M.D., a neurologist, on April 10, 2006. (R. 296-97). Dr. Vaidya described McKenzie's complaints as neck pain radiating across his shoulders and into his arms, right shoulder pain, and headaches. (R. 296). McKenzie reported that any activity intensified the pain. *Id.* Dr. Vaidya reviewed McKenzie's history after the motor vehicle accident, including the surgeries on McKenzie's right shoulder and neck. (R. 296-97). McKenzie's mini-mental status examination was normal. (R. 297). He had restricted range of motion and pain of his neck. *Id.* Dr. Vaidya found that McKenzie had continued paresthesias in both hands as well as "distinct signs indicative of radicular symptoms." *Id.* He recommended EMG nerve conduction studies of both arms. *Id.* Dr. Vaidya did the nerve conduction study on May 16, 2006, and concluded that the findings were suggestive of mild right brachial neuropathy. (R. 294).

On April 24, 2006, McKenzie saw Dr. Knight, whose assessment remained the same. (R. 272).

McKenzie was seen at the Pawhuska Indian Health Center on June 7, 2006 with severe lower back pain. (R. 229).

On July 6, 2006, Dr. Remondino stated that a CT showed that there was a solid fusion at the C6/C7 level of McKenzie's neck. (R. 195). He described McKenzie's continuing neck and interscapular pain, and described his status as "fair." *Id.* He released McKenzie from his care, without restrictions. *Id.* Dr. Remondino repeated this information in a letter dated August 25, 2006. (R. 193-94).

On July 31, 2006, McKenzie saw Dr. Knight, who released McKenzie from his care. (R. 274).

On August 18, 2006, Dr. Munson wrote that he estimated McKenzie's permanent partial impairment to be 10% to his right shoulder and upper extremity secondary to his surgical repair with residuals. (R. 188).

Also on August 18, 2006, Dr. Vaidya wrote a letter to McKenzie's attorneys which again reviewed McKenzie's history following the June 2, 2005 motor vehicle accident. (R. 291-92). Dr. Vaidya listed his clinical diagnoses as traumatic right brachial neuropathy, cervical somatic dysfunction, cervical disk disease with surgical intervention, and right shoulder cuff injury. (R. 292). He said that his opinion was that McKenzie would continue to have symptoms, depending on his level of activity and weather changes, and he recommended that McKenzie avoid lifting heavy weights or over the shoulder activity. *Id.* His opinion was that McKenzie had sustained a 10% permanent partial medical impairment due to neurological issues, excluding his shoulder and cervical disk disease issues. *Id.*

On September 21, 2006, Dr. Remondino wrote another letter to McKenzie's attorneys. (R. 191-92). He gave his opinion that McKenzie sustained a 15% permanent partial disability rating to the body as a whole secondary to his neck injury and subsequent surgical intervention. (R. 191). He also stated that McKenzie might require continued physical therapy and epidural steroid injections. (R. 192). Dr. Remondino stated his opinion that McKenzie would "most likely suffer permanent effects from his injury with chronic recurrent neck pain and possible interscapular pain." *Id.*

McKenzie was seen at the Pawhuska Indian Health Center on May 4, 2007 for prescription consultation related to the June 2, 2005 motor vehicle accident. (R. 307). Dr. Chesbro appeared to write reflex sympathetic dystrophy and back pain as the purposes of the visit. *Id.* McKenzie apparently failed to attend an appointment on July 3, 2007. (R. 306). Notes from a May 9, 2008 appointment are unfortunately partially obscured, but the purposes of the visit appear to be pain management and rheumatoid arthritis. (R. 304). It appears that prescription medications were given. *Id.*

McKenzie was seen by agency consultant Sidney Williams, M.D. for a consultative examination on October 5, 2006. (R. 212-14). Dr. Williams listed McKenzie's complaints as pain in shoulders, hands, arms, and legs; back pain with fusion at C6/C7; low back pain; reflex sympathetic dystrophy in his arms following an explosion in 1995; bilateral carpal tunnel surgery; ulnar nerve tunnel release procedures bilaterally; and status post stellate ganglion block x 29 by a pain specialist. (R. 212). Dr. Williams stated as a general observation that McKenzie was not limping and the speed of his gait appeared normal. (R. 213). On examination, tandem walking was abnormal, and Tinel's signs were positive. (R. 214). Range of motion of McKenzie's neck and right shoulder was limited. *Id.* Dr. Williams noted that McKenzie's grip strength was "markedly decreased" and McKenzie had difficulty effectively manipulating small objects and opposing his thumbs to his fingertips. *Id.* His impressions were derangement of left shoulder, chronic neck strain, status post fusion at C6/C7 with chronic pain, low back pain, reflex sympathetic dystrophy by history, bilateral carpal tunnel syndrome, and bilateral ulnar nerve tunnel syndrome status post release failure. *Id.*

Agency nonexamining consultant Judy Marks-Snelling, D.O., M.P.H., completed a Physical Residual Functional Capacity Assessment on October 23, 2006. (R. 220-27). Dr. Marks-Snelling found that McKenzie had the exertional capacity to perform light work. (R. 221). In the section of the form asking for explanation, she noted his motor vehicle accident and earlier workplace injury. *Id.* She also noted that Dr. Williams found McKenzie had difficulty with grip and hand skill. *Id.* She said that McKenzie had full range of motion, otherwise, with no need for assistive devices such as a wheelchair, and she noted other normal aspects of Dr. Williams' examination. *Id.* She also noted McKenzie's activities of daily living. (R. 221-22). For postural limitations, Dr. Marks-Snelling found that McKenzie could only occasionally stoop. (R. 222). She found no manipulative limitations or other limitations. (R. 223-27).

**Procedural History**

On August 23, 2006, McKenzie filed applications seeking disability insurance benefits and supplemental security income benefits under Titles II and XVI, 42 U.S.C. §§ 401 *et seq*. (R. 103-111). The applications were denied initially and upon reconsideration. (R. 51-55, 58-60). A hearing before ALJ Richard J. Kallsnick was held July 29, 2008 in Tulsa, Oklahoma. (R. 17-45). By decision dated August 28, 2008, the ALJ found that McKenzie was not disabled. (R. 9-16). On June 2, 2010, the Appeals Council denied review of the ALJ's findings. (R. 1-3). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[2] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to

---

[2]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

**Decision of the Administrative Law Judge**

The ALJ found that McKenzie met insured status requirements through December 31, 2009. (R. 11). At Step One, the ALJ found that McKenzie had not engaged in any substantial gainful activity since his alleged onset date of June 2, 2005. *Id.* At Step Two, the ALJ found that McKenzie had severe impairments of status post right shoulder arthroscopy with rotator cuff repair, bilateral cervical radiculopathy, and status post C6/C7 anterior cervical diskectomy and fusion. *Id.* At Step Three, the ALJ found that McKenzie's impairments did not meet a Listing. *Id.*

The ALJ determined that, considering all of McKenzie's impairments, he had the ability to do light work, with only occasional stooping and no other limitations. (R. 12). At Step Four, the ALJ found that McKenzie could not perform his past relevant work. (R. 14). At Step Five, the ALJ found that there were a significant number of jobs in the national economy that a person with McKenzie's age, education, work experience, and RFC could perform. (R. 15). Therefore, the ALJ determined that McKenzie was not disabled at any time from June 2, 2005 through the date of his decision. *Id.*

**Review**

McKenzie raises issues regarding the ALJ's RFC, the ALJ's consideration of the opinion evidence, and the ALJ's credibility assessment. Because the undersigned finds that there is not substantial evidence supporting the ALJ's failure to include a handling restriction in his RFC determination, this case must be reversed and remanded for further consideration. Because reversal is required by the issues relating to McKenzie's use of his hands, the other issues raised by McKenzie are not addressed.

There is not a lot of medical evidence regarding the extent of impairments to McKenzie's ability to manipulate with his hands. Instead, the focus of the physicians after McKenzie's June 2005 motor vehicle accident was on his neck and right shoulder issues, with few references to his hands. When McKenzie was examined by the agency consultant Mr. Williams, however, that physician specifically noted limitations in McKenzie's ability to use his hands:

> [T]he grip strength in the hands is markedly decreased at 3/5 bilaterally with decreased ability to effectively manipulate small objects and oppose thumbs to fingertips. He has difficulty picking up coins and paperclips effectively during the course of this examination.

(R. 214). Thus, the only medical evidence in the record regarding McKenzie's ability to use his hands makes clear that this ability is limited. If he has "markedly decreased" grip strength, together with an inability to effectively manipulate small objects during the course of a brief examination, surely that equates to a functional restriction on his handling ability in a work setting.

Dr. Marks-Snelling completed the Physical Residual Functional Capacity Assessment, and in her narrative explanation for why she found that McKenzie could perform light work, she referred to Dr. Williams' consultative examination. (R. 220-27). She said that Dr. Williams

"noted delay and difficulty with grip and hand skill." (R. 221). In the section for manipulative limitations, however, she checked the box for "none established." She gave no explanation for why she found no limitation when the consultative examiner, who actually saw and examined McKenzie, concluded that McKenzie had difficulty effectively manipulating small objects during the examination.

The Tenth Circuit has long held that opinions of physicians who have examined the claimant only once or who are nonexamining consultants are not substantial evidence if those opinions are forms with boxes checked and not accompanied "by thorough written reports." *Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987). In *Frey*, the treating physician had testified that the claimant had limitation in use of his right arm that included chronic pain. *Id.* at 513. The examining physician checked a box stating that the claimant had no limitation in the use of his right arm. *Id.* at 515. The examining consultant's opinion evidence was not substantial evidence supporting the ALJ's conclusion that the claimant could perform the entire range of sedentary work. *Id. See also Lee v. Barnhart*, 117 Fed. Appx. 674, 678-79 (10th Cir. 2004) (unpublished) (criticizing ALJ's reliance on nonexamining consultant opinion form that was inconsistent with examiner's report and the ALJ's failure "to explain or to reconcile this discrepancy").

Here, the ALJ appears to have attempted to reconcile the discrepancy between Dr. Williams' conclusions on examination that McKenzie had decreased ability to effectively manipulate small objects and Dr. Marks-Snelling's failure to check any boxes indicating any manipulative limitations. (R. 214, 223). The ALJ summarized both reports, including a statement that both reports noted McKenzie's difficulty with fine manipulation. (R. 13). He then stated that Dr. Marks-Snelling remarked on McKenzie's continued ability to do such daily activities as

15

driving, paying bills, working on cars, and socializing. *Id.* By his following statement that Dr. Marks-Snellings' analysis was that there were no manipulative limitations, the ALJ implied that the nonexamining consultant found that McKenzie's continued activities in some way overcame the evidence of the examination of Dr. Williams. However, Dr. Marks-Snelling certainly did not give that explanation herself. The Court finds that neither Dr. Marks-Snelling's remarks, nor the ALJ's implied explanation, meet the requirement that a nonexamining consultant's form with checked boxes can only be substantial evidence if there is a thorough report accompanying that form. Here, the discrepancy between Dr. Marks-Snelling's failure to check any boxes for manipulative limitations and the evidence of examining consultant Dr. Williams is too great to be explained by a comment on the claimant's continuing activities of daily living. Under the circumstances, Dr. Marks-Snellings' report, as to manipulative limitations, did not constitute substantial evidence supporting the ALJ's RFC determination that McKenzie had no manipulative limitations.

Further, although neither party appears to have raised this issue, the Court notes that the ALJ only discussed the evidence of Dr. Munson and Dr. Vaidya in connection with his credibility assessment. (R. 14). The Court notes that Dr. Munson, Dr. Vaidya, and Dr. Remondino all gave opinions in the workers compensation context that McKenzie had permanent partial disability. (R. 188, 191-92, 291-92). Dr. Munson stated that McKenzie was "released to return to his full working activities without restrictions." (R. 188). Dr. Vaidya and Dr. Remondino, however, both stated that McKenzie would likely continue to have significant pain from his conditions and need continuing care. (R. 192, 292). Dr. Vaidya specifically stated that McKenzie should avoid lifting heavy weight and "over the shoulder activity" because it would exacerbate his brachial

16

neuropathy. (R. 292). Thus, there is treating physician opinion evidence supporting a reaching limitation for McKenzie that appears to be consistent with the evidence of the examining consultant Dr. Williams and that does not appear to have been discussed or considered by the ALJ. On remand, this evidence should be appropriately included by the ALJ in his analysis.

Because the errors of the ALJ related to the opinion evidence require reversal, the undersigned does not address the remaining contentions of McKenzie. On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by McKenzie.

The undersigned emphasizes that "[n]o particular result" is dictated on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

## Conclusion

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 3rd day of August, 2011.

_____
Paul J. Cleary
United States Magistrate Judge